**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: COVID-19 Airfare Refund Litigation | MDL Docket No. _____ |

## MEMORANDUM IN SUPPORT OF MOTION FOR TRANSFER OF ACTIONS PURSUANT TO 28 USC § 1407 FOR COORDINATED PRETRIAL PROCEEDINGS

Pursuant to 28 U.S.C. § 1407 and Judicial Panel on Multi-District Litigation ("JPML") Rule 6.2, Movants Deanna Herr, Winifredo Herrera, Macaria Herrera, Jamie Sweet, Stephanie Faust, Anthony Greaves, Minely Diaz, Milica Milosevic, Carlos W. Martinez-Sanchez, Kathy Belanger, Robert Chandler, Martha Dumitrescu, Kevin Polk, and Paula Gimello respectfully move the Panel for an Order transferring the currently-filed cases listed in the attached Schedule of Actions (collectively, "the Actions"), as well as any cases subsequently filed involving similar facts or claims ("tag-along cases") to the United States District Court for the Northern District of Illinois or, alternatively, to any other court with the capacity to facilitate their expeditious litigation.

### INTRODUCTION

The presently-filed Actions are 38 putative class actions (including many overlapping or identical classes) pending in 16 different District Courts, alleging that foreign and domestic passenger airlines have refused to offer required refunds for flights that they cancelled in response to the Covid-19 pandemic. Movants are the plaintiffs in 12 of the Actions.

As alleged in the Actions, the defendant airlines have each refused to honor the refund obligations imposed on them by their own contractual agreements and federal law. Instead, they have offered their customers an unwanted raincheck, functionally taking an interest free bridge loan (which in many cases will never be repaid before the voucher expires) from their customers

1

in addition to the billions of taxpayer dollars provided in the form of federal bailouts. As a result, passengers nationwide have been deprived of refunds to which they are entitled for flights that they did not take, in the midst of the greatest economic crisis in living memory.

On April 3, 2020, the United States Department of Transportation ("DOT") issued a notice to remind airlines including the defendants "that passengers should be refunded promptly when their scheduled flights are cancelled or significantly delayed."  It notes that "[a]lthough the COVID-19 public health emergency has had an unprecedented impact on air travel, the airlines' obligation to refund passengers for cancelled or significantly delayed flights remains unchanged." The notice continues that

> [t]he Department is receiving an increasing number of complaints and inquiries from ticketed passengers, including many with non-refundable tickets, who describe having been denied refunds for flights that were cancelled or significantly delayed. In many of these cases, the passengers stated that the carrier informed them that they would receive vouchers or credits for future travel. But many airlines are dramatically reducing their travel schedules in the wake of the COVID-19 public health emergency. As a result, passengers are left with cancelled or significantly delayed flights and vouchers and credits for future travel that are not readily usable.
> Carriers have a longstanding obligation to provide a prompt refund to a ticketed passenger when the carrier cancels the passenger's flight or makes a significant change in the flight schedule and the passenger chooses not to accept the alternative offered by the carrier.1 The longstanding obligation of carriers to provide refunds for flights that carriers cancel or significantly delay does not cease when the flight disruptions are outside of the carrier's control (e.g., a result of government restrictions).2 The focus is not on whether the flight disruptions are within or outside the carrier's control, but rather on the fact that the cancellation is through no fault of the passenger. Accordingly, the Department continues to view any contract of carriage provision or airline policy that purports to deny refunds to passengers when the carrier cancels a flight, makes a significant schedule change, or significantly delays a flight to be a violation of the carriers' obligation that could subject the carrier to an enforcement action.
> …
> Specifically, the Aviation Enforcement Office will refrain from pursuing an enforcement action against a carrier that provided passengers vouchers for future travel in lieu of refunds for cancelled or significantly delayed flights during the COVID-19 public health emergency so long as: (1) the carrier contacts, in a timely manner, the passengers provided vouchers for flights that the carrier cancelled or

significantly delayed to notify those passengers that they have the option of a refund; (2) the carrier updates its refund policies and contract of carriage provisions to make clear that it provides refunds to passengers if the carrier cancels a flight or makes a significant schedule change; and (3) the carrier reviews with its personnel, including reservationists, ticket counter agents, refund personnel, and other customer service professionals, the circumstances under which refunds should be made.

49 U.S.C. 41712 prohibits unfair or deceptive practices in the air carrier industry and "since at least the time of an Industry Letter of July 15, 1996…the [DOT]'s Aviation Enforcement Office has advised carriers that refusing to refund a non-refundable fare when a flight is canceled and the passenger wishes to cancel is a violation" of that section. Enhancing Airline Passenger Protections, 76 Fed. Reg. 23110-01, at 23129.  In May of 2020, the DOT issued another statement, noting that "[i]n a typical month, the Department receives approximately 1,500 air travel service complaints and inquiries. However, in March 2020 and April 2020, more than 25,000 air travel service complaints and inquiries were filed, many of which concern refunds."

Outraged customers have brought suit in a bevy of class actions across the country. The 38 Actions include cases against foreign (12) and domestic (9) carriers of all sizes, each of which is alleged to have breached its obligation to provide its customers with refunds. Multiple, overlapping class actions have been filed against 11 of the airlines, with as many as 4 such cases brought against a single airline (both Spirit and Frontier). Numerous additional cases will undoubtedly continue to be filed in the coming weeks against these and other carriers.

Each of the defendant airlines' transactions with passengers governed by legally-required contracts of carriage, which in general contain substantially similar provisions mandating refunds in the event of flight cancellation.  Instead of providing refunds to passengers with tickets on cancelled flights, the defendants are each alleged to have provided passengers with expiring

vouchers for future use at a time when many people are uncertain if and when they will be comfortable boarding an aircraft in the future.

## LEGAL STANDARD

Transfer under 28 U.S.C. § 1407 is designed to "provide centralized management under court supervision of pretrial proceedings of multidistrict litigation to assure the 'just and efficient' conduct of such actions." *In re New York City Mun. Sec. Litig.*, 572 F.2d 49, 51 (2d Cir. 1978) (citation and internal quotations omitted). Section 1407 authorizes transfer where (1) one or more cases raising common questions of fact are pending in different districts, (2) transfer would serve the convenience of the parties and witnesses, and (3) transfer would promote the just and efficient conduct of the actions.

The Panel has long recognized that industry-wide class actions seeking refunds from the airline industry are well-suited for transfer and consolidation. *See, e.g., In re Air Fare Litig.*, 322 F. Supp. 1013, 1015 (J.P.M.L. 1971); *In re Pub. Air Travel Tariff Litig.*, 360 F. Supp. 1397, 1398 (J.P.M.L. 1973). Beyond airlines, the Panel has ordered coordination or consolidation of litigation stemming from industry-wide business practices on numerous occasions. *See, e.g., In re Checking Account Overdraft Litig.*, 626 F. Supp. 2d 1333, 1335 (J.P.M.L. 2009). Transfer of the Actions to a single court will allow for orderly and consistent determinations regarding the refund rights of airline passengers nationwide, providing judicial economy and convenience for all parties.

## ARGUMENT

### I.   The Panel Should Order Centralization.

The purpose of multidistrict litigation is to "eliminate the potential for conflicting contemporaneous pretrial rulings by coordinate district and appellate courts in multidistrict related civil actions." *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 491-92 (J.P.M.L. 1968). Cases

should be centralized pursuant to 28 U.S.C. § 1407 if the movant establishes three elements: that "common questions of fact" exist, that centralization will "be for the convenience of [the] parties and witnesses," and that centralization "will promote the just and efficient conduct of [the] actions." *See* 28 U.S.C. § 1407(a). Here, the salient factual core is the same in each case; the pandemic resulted in the cancellation of many flights and the airlines failed to refund passengers for those flights. Because of their overwhelming similarity and the overlapping classes, centralization will serve the convenience of the parties and witnesses and will promote the just and efficient conduct of the actions. Having a single judge preside over and make pretrial rulings for all cases involving pandemic-related airfare refunds will conserve valuable judicial resources. Centralization of the Actions will further each of the aims of 28 U.S.C. § 1407.

### A. This Case Involves Numerous Commonly Asserted Allegations.

Actions should be centralized when they involve common questions of fact. *See In re E.I. du Pont de Nemours & Co. C-8 Personal Injury Litig.*, 939 F. Supp. 2d 1374, 1374 (J.P.M.L. 2013). Section 1407 transfer does not require a complete identity or even a majority of common factual and legal issues. *See, e.g.*, *In re Satyam Computer Servs., Ltd., Sec. Litig.*, 712 F. Supp. 2d 1381, 1382 (J.P.M.L. 2010). Centralization should be granted because the Actions assert nearly identical claims involving common factual allegations and legal theories.

Each of the Actions alleges breach of contract. Most of them allege it as the sole cause of action because other claims are likely preempted by the Airline Deregulation Act of 1978. *See Northwest., Inc. v. Ginsberg*, 572 U.S. 273, 289, 134 S. Ct. 1422, 1433 (2014). "[T]he elements of breach of contract do not differ much from state to state." *Rapp v. Green Tree Servicing, Ltd. Liab. Co.*, 302 F.R.D. 505, 509 (D. Minn. 2014). To the extent that there are any significant differences between the airlines' contracts of carriage with respect to the entitlement of customers

to refunds, those differences are likely irrelevant. This is because DOT and other federal guidance and regulation mandates the issuance of such refunds such that any contractual provision that would purport to require a contrary outcome is likely void as contrary to law and/or public policy.

That defenses may be asserted across all or nearly all of the Actions further supports centralization. For example, in *In re Yosemite National Park Hantavirus Litigation*, 24 F. Supp. 3d 1370, 1370 (J.P.M.L. 2014), the Panel found that "not only will these actions involve common questions with regard to the alleged negligence of the defendants, but it is anticipated that the United States will assert jurisdictional defenses under the Federal Tort Claims Act (FTCA)." It continued, "[i]n our experience, such defenses . . . often entail complicated and lengthy discovery practice. Such discovery will be common across all the actions." *Id.*

While the Actions share a remarkably similar common core, the presence of individual issues does not foreclose MDL treatment, and the Panel has made clear that "centralization under Section 1407 does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer." *In re Zimmer Nexgen Knee Implant Prods. Liab. Litig.*, 802 F. Supp. 2d 1374, 1376-77 (J.P.M.L. 2011); *accord*, *e.g.*, *In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 65 F. Supp. 3d 1402, 1404 (J.P.M.L. 2014) ("While we agree that these actions present a number of individualized factual issues, the existence of such issues does not negate the common ones."); *In re Katz Interactive Call Processing Patent Litig.*, 481 F. Supp. 2d 1353, 1355 (J.P.M.L. 2007) ("Transfer under Section 1407 does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer.").*See*, *e.g.*, *In re Proton-Pump Inhibitor Prods. Liab. Litig. (No. II)*, 261 F. Supp. 3d 1351, 1354 (J.P.M.L. 2017) (granting MDL treatment where constituent cases presented common questions of fact, even though they involved multiple defendants and multiple products and all cases did not involve all defendants).

Multi-defendant MDLs are particularly appropriate where the conduct alleged is functionally identical and there are numerous overlapping issues. *See, e.g., In re Managed Care Litig.,* 2000 WL 1925080, at *2 (J.P.M.L. Oct. 23, 2000) (consolidating multiple actions against disparate defendants over defendants' objection that the actions should be separate consolidated MDLs organized by defendant); *In re Checking Account Overdraft Litig.*, 626 F. Supp. 2d 1333, 1335 (J.P.M.L. 2009) ("While there will be some unique questions of fact from bank-to-bank, these actions share sufficient factual questions relating to industry-wide bank posting policies and procedures to warrant centralization of all actions in one MDL docket."); *In re National Prescription Opiate Litig.*, 290 F. Supp. 3d 1375, 1379 (J.P.M.L. 2017) ("Although individualized factual issues may arise in each action, such issues do not – especially at this early stage of litigation – negate the efficiencies to be gained by centralization. The transferee judge might find it useful, for example, to establish different tracks for the different types of parties or claims.").

The core allegations in each of the Actions are functionally the same and differ only by the parties named. In every Action, each of the defendants is alleged to have cancelled flights in response to the pandemic without providing refunds to ticketed passengers in violation of its contractual obligations. Though there will certainly be "unique questions of fact from" airline-to-airline, "these actions share sufficient factual questions relating to industry-wide [airline refund] policies and procedures to warrant centralization of all actions in one MDL docket. *See In re Checking Account Overdraft Litig.*, 626 F. Supp. 2d 1333, 1335 (J.P.M.L. 2009).

**B. Transfer Will Promote Judicial Economy and Provide Convenience for the Parties and Witnesses.**

Without transfer, coordination, and/or consolidation of these Actions and tag-along cases, litigation addressing this issue of nationwide import will needlessly entail judicial inefficiency, overlapping discovery, and unnecessary expense. Different federal courts, in duplicating rulings

on the same issues, could make contradictory findings on significant pre-trial disputes. Litigation of this scope and importance should not be beset with such inconsistencies and inefficiencies. Given the similarity of the Actions and the potential for duplicative discovery, transfer would inevitably conserve the parties' resources and prevent repetitive instances of the same factual inquiries and pretrial rulings. *See, e.g., In re Air Crash at Dallas/Fort Worth Airport*, 623 F. Supp. 634, 635 (J.P.M.L. 1985). An important feature of centralization is to "[prevent inconsistent pretrial rulings, especially with respect to class certification[.]" *In re Wireless Tel. Servs. Antitrust Litig.*, 249 F. Supp. 2d 1379, 1380 (J.P.M.L. 2003). Numerous overlapping class actions are particularly well-suited for MDL treatment. *See, e.g., In re Comp. of Managerial, Prof'l & Tech. Emples. Antitrust Litig.*, 206 F. Supp. 2d 1374, 1375 (J.P.M.L. 2002); *In re Propulsid Prods. Liab. Litig. v. Johnson & Johnson, Co.*, DOCKET NO. 1355, C.A. No. 2:00-282, C.A. No. 3:00-12, 2000 U.S. Dist. LEXIS 11651, at *2-3 (J.P.M.L. Aug. 7, 2000).

There are already many different sets of attorneys for the plaintiffs in the Actions, and given the early stage of the litigation it is likely that there will be more. This too counsels in favor of transfer. *See In re Discover Card Payment Prot. Plan Mktg. & Sales Practices Litig.*, 764 F. Supp. 2d 1341, 1343 (J.P.M.L. 2011) ("the actions and potential tag-along actions in this litigation are brought by several competing counsel, which makes voluntary cooperation among counsel in the different districts a less workable alternative[.]). Transfer will therefore provide convenience to all parties.

Centralization would promote judicial economy by allowing a single judge to develop expertise in the common factual and legal questions and make consistent rulings that may apply to, and/or inform decisions across, multiple cases. Due to the (likely increasing) number of actions, jurisdictions, and counsel involved, informal coordination is not a viable alternative to streamline

8

the pretrial litigation process." [T]ransfer under Section 1407 has the salutary effect of placing all actions in th[e] docket before a single judge who can formulate a pretrial program that: 1) allows discovery with respect to any non-common issues to proceed concurrently with discovery on common issues; [] and 2) ensures that pretrial proceedings will be conducted in a manner leading to a just and expeditious resolution of the actions to the benefit of not just some but all of the litigation's parties." *In re Ins. Brokerage Antitrust Litig., 360 F. Supp. 2d at 1372*.

## II.    II.  The Panel Should Order Centralization in the Northern District of Illinois, or Any Other District Court With the Resources to Quickly Advance the Litigation.

In determining the appropriate transferee district, the Panel considers a variety of factors, including: (1) whether the district "offers a forum that is both convenient and accessible for the parties and witnesses"; (2) the location of "relevant witnesses and evidence"; (3) the positions of the parties; and (4) the experience of the transferee judge and district in navigating "the nuances of complex and multidistrict litigation." *In re: Aggrenox Antitrust Litig.*, 11 F. Supp. 3d 1342, 1343 (J.P.M.L. 2014). This Panel has also recognized the importance of transferring actions to a "court that has the resources available to manage this litigation"—a particularly acute consideration here given the circumstances surrounding the Actions. *In re ClassicStar Mare Lease Litig.*, 528 F. Supp. 2d 1345, 1347 (J.P.M.L. 2007).

Airline passengers across the country have been affected by the conduct alleged in the Actions. The Actions are geographically dispersed, and the practical reality is that electronic discovery is equally accessible in any forum. Any of the districts in which matters are currently pending (or some other district) may thus be appropriate for centralization. *In re Onglyza (Saxagliptin) & Kombiglyze XR (Saxagliptin & Metformin) Prod. Liab. Litig.*, 289 F. Supp. 3d 1357, 1359 (J.P.M.L. 2018) ("Given that the drugs at issue here were marketed nationwide, and

no action or group of actions is significantly advanced, any number of potential transferee districts would be appropriate.").

Movants' primary objective is to ensure the prompt centralization of these cases before a court that has the time and inclination to address this matter on an expedited basis. The Panel may conclude that transferring these actions to one of the districts in which a case is pending, or some other district altogether, will best ensure a prompt and efficient resolution of this important women's health matter. Movants propose as candidate forums the Northern District of Illinois (in which the first-filed of any of the actions is among those pending before the Honorable Thomas M. Durkin, who is not currently assigned an MDL); the Southern District of Florida (home to the cases against Spirit Airlines, against which more of the Actions have been filed than any other defendant, and where the Honorable Roy K. Altman presides over two cases and is not assigned an MDL); and the Northern District of Georgia (in which Delta, the world's largest airline by revenue is headquartered, and where the Honorable Eleanor L. Ross presently presides over multiple cases).

## CONCLUSION

The overwhelming factual similarities across the Actions combined with the legal streamlining provided by preemption of non-contractual claims make these cases ideally suited for centralization. Centralization will provide a uniform and orderly resolution to this industry-wide practice that has disadvantaged people across the United States in a time of great need. It will avoid wasting the resources of the parties and of courts across the country, and ensure consistency of important pre-trial rulings, including on class certification. Movants Deanna Herr, Winifredo Herrera, Macaria Herrera, Jamie Sweet, Stephanie Faust, Anthony Greaves, Minely Diaz, Milica Milosevic, Carlos W. Martinez-Sanchez, Kathy Belanger, Robert Chandler, Martha Dumitrescu,

Kevin Polk, and Paula Gimello therefore request that the Panel transfer the Actions and any tag-along cases to the United States District Court for the Northern District of Illinois or such other venue as the Panel shall determine.

DATED:  June 8, 2020                                    Respectfully submitted,

**LIDDLE & DUBIN, P.C.**

s/ Nicholas A. Coulson
Nicholas A. Coulson
975 E. Jefferson Avenue
Detroit, Michigan 48207
Tel: 313-392-0015
Fax: 313-392-0025

ncoulson@ldclassaction.com

*One of the Attorneys for Deanna Herr, Winifredo Herrera, Macaria Herrera, Jamie Sweet, Stephanie Faust, Anthony Greaves, Minely Diaz, Milica Milosevic, Carlos W. Martinez-Sanchez, Kathy Belanger, Robert Chandler, Martha Dumitrescu, Kevin Polk, and Paula Gimello*